UNITED STATES of America

v.

Daniel AVERSA, Vincent Mento.

Crim. Nos. 90–76–01–L, 90–76–02–L.

United States District Court,
D. New Hampshire.

April 29, 1991.

Robert V. Johnson, Concord, N.H., for Daniel Aversa.

Clifford J. Ross, Manchester, N.H., for Vincent Mento.

MEMORANDUM OPINION

LOUGHLIN, District Judge.

The defendants were convicted in this court of charges relating to the structuring

of currency transactions to avoid the filing of a Currency Transaction Report.

After this court had ruled on several preliminary motions, Mr. Aversa pled guilty to one count of structuring a currency transaction to avoid the reporting laws, but retained the right to appeal certain questions of law. Mr. Mento was convicted after a jury trial.

Mr. Mento has asked this court to set aside his conviction in light of the recent Supreme Court decision in *Cheek v. United States*, — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). Mr. Aversa has raised similar issues in his "Memorandum Relative to Disposition."

■ The defendants have both been sentenced, but neither is in custody. Therefore this court does not have jurisdiction under 28 U.S.C. § 2255 to set aside the convictions. *United States v. Michaud*, 901 F.2d 5 (1st Cir.1990) (per curiam). Nor may this court consider a motion for a new trial or a motion for judgment of acquittal as the time in which such motions may be filed has expired. Fed.R.Crim.P. 29, 32.

■ In cases where relief under 28 U.S.C. § 2255 would be available but for the failure to satisfy the custody requirement, this court may consider the motion as a writ of error *coram nobis*. This writ has been preserved under the All Writs Act, 28 U.S.C. § 1651(a), in contexts in which it has not been repealed or replaced. *See United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954); *cf.* Fed.R. Civ.P. 60 (replacing *coram nobis* in civil actions).

■ To be entitled to relief under this writ, the defendant must show that his trial contained error, that that error affected the trial's fundamental fairness and that the writ is the only relief available to him to protect him from further harm. *See United States v. Morgan*, 346 U.S. at 512, 74 S.Ct. at 253; *United States v. Michaud*,

925 F.2d 37 (1st Cir.1991); *see also, United States v. Addonizio*, 442 U.S. 178, 186, 99 S.Ct. 2235, 2241, 60 L.Ed.2d 805 (1979) (collateral attack under 28 U.S.C. § 2255). After a review of the facts, the court will consider each of these requirements.

*Statement of facts.*

There was little dispute as to the facts of this case. Mr. Mento was involved in a legitimate real estate transaction with his partner, Daniel Aversa. Mr. Aversa was experiencing marital problems and did not want his wife to be able to trace his assets[1]. He therefore asked Mr. Mento to give him his share of the proceeds in cash. Both men knew that banks were required to fill out reports on cash transactions of more than $10,000, but it is not clear that they understood the actual mechanics of the reporting requirement.

The two men did not want the currency transaction to be reported. They therefore structured their transaction to avoid the requirement that the bank fill out the Currency Transaction Reports. While the court found at the sentencing hearing that Mr. Aversa had initiated the structuring, the government argued that keeping the transactions under $10,000 was Mr. Mento's idea. In any event, the government showed that at the time Mr. Mento agreed to let Mr. Aversa deposit his share of the proceeds into Mr. Mento's account, the two men agreed to do two things in order to avoid having the Internal Revenue Service (IRS) erroneously assume that the money was income to Mr. Mento. First, Mr. Aversa signed a letter for Mr. Mento stating that all of the money belonged to him, and second Mr. Aversa kept his deposits under $10,000 in order to avoid raising any "red flags" with the IRS.

Mr. Aversa, therefore, made several deposits to and withdrawals from Mr. Mento's bank account of cash in amounts just under $10,000. The government alleged that on at least one occasion Mr. Aversa

---

1. Mr. Aversa and his wife were experiencing difficulty in having children and Mr. Aversa felt that this might eventually lead to an end to their marriage. Mr. Aversa seems to understand now what Mr. Mento told him at the time. Trying to protect his money in this way was wrong and stupid. Not only has the marriage apparently survived this episode, but Mrs. Aversa was pregnant at the time of the disposition.

gave a false name to a bank teller, but there was no evidence that this was part of the two men's plan.

That is the extent of the conduct that the government alleged, and quite certainly the most that the government proved, in this case. There was no evidence that the money involved came from illegal activities. The prosecutor did not dispute this and on several occasions proffered that the government had found no evidence that the money was ill-gotten.[2] In fact, if one believes the version of the facts offered by the government at sentencing, one can only conclude that the Aversa letter and the structuring were both designed to prevent the IRS from getting the *false* impression that the money belonged to Mr. Mento rather than Mr. Aversa.

Although Mr. Mento was correct when he advised Mr. Aversa that hiding the money from his wife was unwise, and while, had Mr. Aversa gone through with his plan, hiding the money would have been wrong, this is not the conduct with which the defendants were charged and the United States never claimed that the defendants' underlying conduct was violative of federal law. The defendants were not trying to avoid taxes, but they were trying to avoid having the IRS think that money belonging to Mr. Aversa actually belonged to Mr. Mento.

Mr. Aversa used a false name at the bank. He explained that he thought that the teller knew his wife. When confronted with this by investigators the first time, he said he had not used a false name. He immediately tried to correct this by calling the Assistant U.S. Attorney to explain that he had been caught off guard and embarrassed when it had been brought up. The court finds the two men to be credible witnesses. They were honest to the government to their own detriment even when they had a right to remain silent. Neither man contradicted himself or changed his story. In fact, Mr. Aversa's

explanation is consistent with one of the versions of events offered by Assistant U.S. Attorney Walsh at the sentencing. When arguing for a jail sentence for Mr. Mento Mr. Walsh claimed that Mr. Aversa had no reason not to file a CTR in this case as he had in the past:

> The conditions were that Mr. Aversa execute a letter admitting the money was his in case the IRS came around asking Mr. Mento where this money came from and why it wasn't reported on the appropriate tax form; and secondly that the transaction be structured in such a way that the $10,000 reporting requirement not be triggered. Mr. Mento set those ground rules....
>
> I think it's fair to say that but for Mr. Mento's insistence the law would not have been violated. Mr. Aversa had a currency report to file in his own name in the past and for all that anybody knows didn't object to it then, but because he agreed with and assisted Mr. Mento in the structuring of the money into this account he is and stands before the court convicted of these violations.

Disposition transcript at 26, 27 (document no. 45).

On the other hand, when Mr. Walsh was discussing Mr. Aversa's sentence, he argued that Mr. Aversa lied to the teller about his name so that only Mr. Mento's name and not his own would go on the CTR if one was filed:

> [Mr. Aversa] also made false statements with respect to the appearance at the bank and lying about his identity, the government submits for more serious reason than he admitted to, which is if a report was to be filed it would be in the name of John Kelly, not Daniel Aversa; that Numerica Bank would not know other than Vincent Mento what other name to put on that CTR....

*Id.* at 19, 20.

There was no evidence that Mr. Mento or Mr. Aversa meant to hide the transaction

2. At the sentencing, for the first time, the government attorney argued that he was not positive that all of the money came from the real estate transaction and that some of the money might be "unaccounted for." Disposition Transcript at 25 (document no. 45). After all of the statements at trial to the contrary, including statements by the government, these new doubts seem self-serving and more than a little disingenuous.

from the IRS. In fact, the evidence showed that Mr. Mento had reported the transaction *fully* on his tax return *before* the government investigation and there was evidence at the sentencing that Mr. Aversa also reported his share of the proceeds on his tax return.

The overwhelming weight of the evidence showed that the two men did not believe that they were breaking any law. When they were called in to speak with an IRS special agent they told their stories. The two admitted that they structured the transaction to avoid the reporting requirement but assured the agent that they were doing nothing illegal. They just wanted to avoid raising any "red flags" that would give the IRS a false impression. When the agent called in the Assistant U.S. Attorney who would later prosecute the case, both men once again told the full stories. The Assistant U.S. Attorney must have thought that there would be little factual dispute about these interviews because he acted as prosecutor in this case, despite the fact that the interviews were not recorded and the IRS special agent had, for a time, misplaced his original notes. Had there been a factual dispute that would have required the Assistant U.S. Attorney to be a possible witness, the court trusts that he would not have attempted to try the case. The two men obviously thought that because they had done nothing illegal they could tell the special agent everything.

Mr. Mento was so sure that the truth would exonerate him that he told the story a third time. This time, much to his attorney's dismay, he told it to the jury from the witness stand. Mr. Mento told the jury that he knew about the reporting requirement but he thought that he had avoided breaking the law by structuring his transaction.

At Mr. Mento's trial, the prosecutor relied mostly on Mr. Mento's own words to convict him. There was no evidence that Mr. Mento knew that structuring was illegal. The evidence showed just the opposite to be the case. Mr. Mento's only defense was that he did not know he was breaking the law. The prosecutor did not refute this. Instead, the prosecutor argued that Mr. Mento's knowledge of the criminality of structuring was irrelevant. Knowledge of the reporting requirement and structuring to avoid it was all that need be proved. Armed with a favorable jury instruction based on the decision in *United States v. Scanio*, 900 F.2d 485 (2d Cir.1990), the prosecutor's task in obtaining a conviction in this case was no more difficult than shooting fish in a barrel.

Mr. Mento admitted the factual allegations of the prosecutor at trial. Thus, the only defense in Mr. Mento's case was that he lacked the requisite *mens rea*. While the court did instruct the jury that the prosecutor was required to prove knowing and willful conduct and recited the standard definitions of these terms, at the prosecutor's request the jury was also given the following instruction based on the holding in *Scanio:*

It is not necessary that the United States prove that the defendant knew that the structuring of his currency transactions was unlawful.

It is only required that the defendant knew of the currency reporting requirement of financial institutions and that he intentionally structured his currency transactions to evade that currency reporting requirement.

In light of the recent Supreme Court decision in *Cheek v. United States*, 111 S.Ct. 604, the court has reexamined the *Scanio* reasoning and finds that this instruction is not a correct statement of the willfulness requirement.

*The Scanio decision.*

 In order to understand the holding in *Scanio*, it is helpful to briefly recount the history of the structuring statute. Treasury regulations promulgated under the authority of the Bank Secrecy Act of 1970, 31 U.S.C. § 5313(a), require banks to report currency transactions in excess of $10,000. 31 C.F.R. § 103.22(a)(1) (1989). The regulations make the financial institutions and not the individuals dealing with those institutions responsible for the filing of these reports. *Id.; see California Banker's Ass'n v. Schultz*, 416 U.S. 21, 58,

69–70 & n. 29, 94 S.Ct. 1494, 1516, 1521–22 & n. 29, 39 L.Ed.2d 812 (1974).

The reporting requirement was put in place in order to assist in law enforcement efforts as "[t]he deposit and withdrawal of large amounts of currency ... under unusual circumstances may betray a criminal activity." H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* U.S.Code Cong. & Admin.News 1970, 4394, 4396. It was clear that criminals often avoided detection of their currency transactions by structuring large reportable transactions into a number of smaller transactions under $10,-000, but there was no specific statute making structuring illegal. The government, therefore, prosecuted those who engaged in such transactions "either for willfully causing a financial institution to fail to file a CTR, *see* 18 U.S.C. § 2(b), for knowingly and willfully concealing a material fact from the government, 18 U.S.C. § 1001, or for conspiracy, 18 U.S.C. § 371." *Scanio*, 900 F.2d at 488. While several circuits affirmed structuring convictions, *see, e.g.,* *United States v. Heyman*, 794 F.2d 788, 790–93 (2d Cir.1986), *cert. denied*, 479 U.S. 989, 107 S.Ct. 585, 93 L.Ed.2d 587 (1986); *United States v. Thompson*, 603 F.2d 1200, 1202–04 (5th Cir.1979); *United States v. Tobon–Builes*, 706 F.2d 1092, 1096–1101 (11th Cir.1983), others including the First Circuit unequivocally and strongly rejected this approach:

> Although this court, like all other institutions of the United States, is supportive of the law enforcement goals of the government and society, we cannot engage in unprincipled interpretation of the law, lest we foment lawlessness instead of compliance. This is particularly so when the confusion and uncertainty in the law has been caused by the government itself, and when the solution to that situation, namely eliminating any perceived loop holes, lies completely within the government's control. If the government wishes to impose a duty on customers, or "other participants in the transaction," to report "structured" transactions, let it require so in plain language. It should not attempt to impose such a duty by implication, expecting that the

courts will stretch statutory construction past the breaking point to accommodate the government's interpretation.

*United States v. Anzalone*, 766 F.2d 676, 682 (1st Cir.1985).

In 1986, as part of the Anti–Drug Abuse Act of 1986, in response to cases such as *Anzalone*, Congress enacted 31 U.S.C. § 5324 which provides that:

> No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction ...
>
> (3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

31 U.S.C. § 5324. Criminal penalties for *willfully* violating § 5324 or any of a number of other related sections are provided in 31 U.S.C. § 5322(a).

In all other contexts, the requirement in 31 U.S.C. § 5322(a) that the violation must be willful necessitates proof that the defendant knew or should have known of the law he has allegedly violated. *United States v. Bank of New England*, 821 F.2d 844, 854, 857 (1st Cir.1987); *United States v. Hernando Ospina*, 798 F.2d 1570, 1580 (11th Cir.1986); *United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir.1984); *United States v. San Juan*, 545 F.2d 314, 318 (2d Cir.1976).

In *Scanio*, however, the Second Circuit held that the willfulness requirement of § 5322(a) should be interpreted contextually. The Second Circuit looked at the legislative history of § 5324(3) and found that Congress had adequately protected "unwary bank customers by requiring proof that they knew of, and intended to evade, the reporting provision—rather than by requiring proof that they knew that structuring is unlawful." *Scanio*, 900 F.2d at 491.

31 U.S.C. § 5324(3) is not the statute that imposes criminal penalties for the conduct charged, however. The section that does, § 5322, was not changed by Congress when it adopted § 5324(3). And the inclusion of the term "willfully" in that statute has always required an *extra* showing from

the government. *See, e.g., United States v. Bank of New England,* 821 F.2d 844 (1st Cir.1987); *United States v. $359,000 in United States Currency,* 828 F.2d 930, 933 (2d Cir.1987) (" 'Willfully' in § 5322 modifies 'violat[es]' thereby making knowledge of the reporting requirement 'an additional element the government must prove to secure a criminal' conviction.") (quoting *United States v. $122,043.00 in United States Currency,* 792 F.2d 1470, 1474 (9th Cir. 1986)).

The Second Circuit explained this inconsistency:

> To the extent our present interpretation of § 5322(a) seems inconsistent with our interpretation of the same provision in the context of a prosecution for failure to file Currency and Monetary Instrument Reports required under § 5316, *see, e.g., [United States v.] San Juan,* 545 F.2d [314], at 318–19 (2d Cir.1976) (necessitating proof that defendant knew, or should have known of the law he is alleged to have violated), we reiterate that, unlike § 5316 which requires individuals to report otherwise innocent transactions. § 5324(3) prohibits purposeful conduct aimed at defeating the government's right to information. Where a defendant is charged with violating an obscure reporting provision, proof that (s)he was specifically aware of the reporting provision is necessary to establish criminal intent. With respect to a prosecution for structuring, however, the requirement that a defendant be shown to have acted with a "bad purpose" is satisfied by proof that (s)he (1) knew that the bank was legally obligated to report currency transactions exceeding $10,000 and (2) intended to deprive the government of information to which it is entitled.

*Scanio,* 900 F.2d at 490, 491.

Thus, the Second Circuit recognizes that where an obscure regulation requires one to report otherwise innocent transactions, it is necessary for the government to show that the defendant intended to break the law. The court also assumes that persons who structure are not involved in otherwise innocent transactions. The Ninth Circuit also assumed that persons who structure currency transactions must be involved in other criminal activity:

> [S]tructuring is not the kind of activity that an ordinary person would do innocently. Only the person who has a deliberate intention to frustrate the reporting by the banks is guilty of the offense.... The statute is like the narcotics statutes construed in [*United States v.*] *Balint* [258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922)] and [*United States v.*] *Behrman, supra* [258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922)]: intent to do the act suffices.

*United States v. Hoyland,* 903 F.2d 1288, 1292 (9th Cir.1990).

There is, in this statement, the implicit assumption that those who structure currency transactions must be involved in something illegal. The cases of Vincent Mento and Daniel Aversa belie that assumption.

There are many occasions in the life of a businessman in which he structures transactions in order to avoid the impact of some regulation or tax. One may structure a company to reduce tax liability, one may structure a transaction over the course of several years to change the way a regulation affects them. If one is not trying to deprive the government of something to which the government is entitled, there is nothing illegal about such structuring. Daniel Aversa and Vincent Mento thought that this was true of the structuring of currency transactions.

Vincent Mento and Daniel Aversa were not involved in crimes or drugs. They were not trying to avoid giving the government any taxes or information about their business. They did not know that structuring the transaction was illegal. Nor did they have reason to know. The Treasury Department proposed, but failed to adopt, regulations to publicize the new anti-structuring provision. *See* 53 Fed.Reg. 7,948 (1988), 54 Fed.Reg. 20,398 (1989). Neither man was a banker for whom familiarity with such federal regulations might be required in order to perform his job properly.

*See e.g., Bank of New England,* 821 F.2d at 857.

While hesitant to do so, this court gave the *Scanio* instruction, thus removing from the jury's consideration the question of whether Vincent Mento knew that he was breaking the law. In light of the recent holding in *Cheek v. United States, supra,* the court is compelled to reexamine the *Scanio* holding.

*The Cheek decision.*

The defendant in *Cheek* was charged with willfully failing to file an income tax return and willfully attempting to evade his income taxes in violation of 26 U.S.C. §§ 7203 and 7201. In that case, the Supreme Court held that even where the law is as well known as the law requiring the filing of an income tax return, criminal conviction for a "willful" violation of the tax laws requires a showing of specific intent to violate the law:

> The general rule that ignorance of the law or a mistake of law is no defense to a criminal prosecution is deeply rooted in the American legal system. Based on the notion that the law is definite and knowable, the common law presumed that every person knew the law. This common law rule has been applied by the Court in numerous cases construing the criminal statutes.
>
> The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common law presumption by making specific intent to violate the law an element of certain federal tax offenses. Thus the Court almost 60 years ago interpreted the statutory term "willfully" as used in the federal criminal tax statutes as carving out an exception to the traditional rule. This special treatment of criminal tax offenses is largely due to the complexity of the tax law.

*Cheek,* 111 S.Ct. at 609 (citations omitted).

While the special treatment of the tax laws may have been due to their complexity, *Cheek* makes it clear that where Congress uses the term willfully in connection with the tax laws, specific intent to violate the law will be required for conviction even for something as relatively simple and well understood as filing a tax return. *Id.*

While § 5322(a) may not be technically a criminal *tax* law it is certainly a criminal law related to taxation. Except in the structuring context, the inclusion of the term "willfully" in § 5322(a) has been universally interpreted as requiring the same *mens rea* of specific intent to violate the law as it does in relation to the other tax laws such as §§ 7201 and 7203.

Understanding one's duties under the structuring statute is certainly more difficult and less common than understanding ones duty to file a tax return. In order to understand one's legal duty not to structure a currency transaction one must be familiar with one federal regulation, 31 C.F.R. § 103.22(a)(1), and one statute prohibiting the conduct. 31 U.S.C. § 5324. To know that structuring is a criminal act, one must be familiar with an additional federal statute. 31 U.S.C. § 5322(a).

The reasons for requiring a specific intent to violate the law in this case are at least as compelling as the reasons referred to in *Cheek.* Reverting to the common law rule that ignorance of the law is no excuse caused a miscarriage of justice in this case.

*Statutory construction.*

It is well settled that criminal defendants are entitled to strict statutory construction. *See, e.g. Anzalone,* 766 F.2d 676, 678; *Slater v. United States,* 562 F.2d 58, 59 (1st Cir.1976). The *Scanio* interpretation of § 5322 violates the rule that "[a]ll words and provisions of a statute are intended to have meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous." *United States v. Ven–Fuel,* 758 F.2d 741, 751, 752 (1st Cir.1985); *see also Breest v. Cunningham,* 752 F.2d 8, 10 (1st Cir.1985); *cf. United States v. Colon–Ortiz,* 866 F.2d 6, 10, 11 (1st Cir.1989) (where language added through mistake or inadvertence it should not be given effect). In

**448**

the present case § 5324 applies to structuring *"for the purpose of evading the reporting requirements."* 31 U.S.C. § 5324 (emphasis added). In order to do that one must know that the reporting requirements exist. If one follows the reasoning of *Scanio* that the "willfulness" requirement of § 5322 is satisfied by knowledge of the reporting requirements and nothing more, then there is no difference between "willfully violating" § 5324 and "violating" § 5324. Only "willful" violations of § 5324 are made criminal by § 5322. The only way that "willful" has any meaning in this context is if it means a specific intent to violate the law.

*Availability of coram nobis.*

 The court therefore finds that it committed error at the trial by giving the *Scanio* instruction rather than instructing the jury that the statute required a specific intent to violate a known legal duty. The court also finds that this error affected the fundamental fairness of the trial by keeping from the jury an important factual determination. *Cheek,* 111 S.Ct. at 611. In order to be entitled to a new trial under a Writ of Error *Coram Nobis,* a defendant must also show that no other relief is available to him to protect him from the error. Where, as here, an appeal is available to correct the error of the trial court this court may not grant the relief requested. *See United States v. Morgan,* 346 U.S. at 512, 74 S.Ct. at 253; *see also, United States v. Addonizio,* 442 U.S. at 186, 99 S.Ct. at 2241.

*Other Matters.*

From the beginning, the conduct of this case and the decision to bring it has been disturbing. The court has raised these concerns repeatedly. Feeling bound by the *Scanio* decision this court instructed the jury improperly. It is within the discretion of the United States Attorney to decide who to charge with criminal activity. Whether or not the United States Attorney issues statements to the press is also a decision that must be made by him. The court finds the press release in this case to be outrageous and unfair. It smeared the

reputation of these two men. By taking the *mens rea* issue away from the jury and thereby assuring the conviction of Mr. Mento, the court has in some sense helped to lend credibility to the misleading statements in the press. It is for this reason, as well as a general discomfort with this entire case that the court has addressed some of the issues in this memorandum even while powerless to grant a new trial.

One thing that is perfectly clear to the court is that this is a case that was never contemplated by the drafters of the statute and is a case that never should have been brought by the United States Attorney. There are enough drug dealers and racketeers out there that are legitimate targets of this statute; the United States Attorney should not be wasting the government's time and money charging a man the government admits was not involved in drugs and not laundering ill-gotten gains and not keeping any information from the United States. There is only one explanation for the bringing of these charges—It was easy. Mr. Mento was so sure that he was not violating any laws that he told the entire story to Agent Hatem, and then repeated it to Assistant U.S. Attorney Walsh. All Mr. Walsh had to do was walk down the hall to the grand jury, and he was assured an indictment. All he had to do was convince this court to give the *Scanio* instruction and he was assured of a conviction. All based on the defendants own words.

*The press releases.*

At the time of the indictment, the United States Attorney reported to the press and the press reported to the public that these two men had been arrested for money-laundering. While the United States Attorney may not have said that these men were involved in drugs or racketeering, he did nothing to dispel that impression:

> The indictments are a sign that prosecutors are serious about using the money laundering laws, a tool that allows them to charge people for handling money illegally without having to prove that the money was gained illegally, said Jeffrey Howard, U.S. Attorney for New Hampshire.

"The indictments are important because they are examples of the commitment the I.R.S. has made ... to use the money laundering statutes in order to ferret out tax evasion, drug trafficking and other crimes," he said.

Prosecutors declined to say how Aversa and Mento got the money or why they believe the men tried to evade the currency laws.

*2 developers face federal indictments; Attorney: Money laundered,* Concord Monitor, June 29, 1991, at A–1 (emphasis in original).

According to the attorney for defendant Aversa on October 17, 1990, following the conviction of Mr. Mento, the prosecutor issued a press release that stated that he had sent "a strong clear message that persons who violate the currency reporting laws and the laws which prohibit structuring to evade those laws will be vigorously prosecuted ... to assist in the investigation of related criminal conduct, such as narcotics trafficking, organized crime and racketeering activity and tax violations." At this point it was quite clear that Mr. Mento and Mr. Aversa were not involved in narcotics trafficking, were not involved in organized crime, were not involved in racketeering activity and were not involved in tax violations. The United States Attorney did not make clear to the press what his assistant had made clear to the court. The government had no evidence that the money involved was ill-gotten or that the two men were attempting in any way to evade taxes. The court agrees with Mr. Mento's attorney, Clifford Ross, that in the context in which it was issued, this press release is misleading and cruel.

*The sentence imposed.*

■ If the First Circuit decides that this court erred in its instructions regarding the *mens rea* required for a conviction for structuring then the issue of sentencing will be moot. Nevertheless, this court was required to sentence the two defendants and did so. The court determined that a downward departure was warranted in this case. It seems that if a downward departure is not appropriate in this case, then there shall never be a case where it is. Nevertheless, it is important to outline the reasons that the court felt that a departure was warranted in this case.

In sentencing the defendants, the court was required to assume that the convictions were valid and thus, that the reasoning of *Scanio* was sound. It would be inappropriate for the court to depart downward because it disagreed with the law, and that is emphatically not what the court has done here.

The First Circuit has made clear that departures should be the exception rather than the rule:

Under the Sentencing Reform Act, a district court may depart from the guidelines if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." Departure is permitted in those cases where idiosyncratic circumstances warrant individualization of sentence beyond that which is possible within the comparatively close-hewn parameters constructed by the guidelines. Such circumstances are those which "cannot, by their very nature, be comprehensively listed and analyzed in advance." And because departures are meant to be the exception, not the rule, there must be something "special" about a given offender, or the accoutrements of the crime committed which distinguishes the case from the minerun for that offense. "When a court finds an atypical case, one to which a particular guideline linguistically applies but where the conduct differs significantly from the norm, the court may consider whether a departure is warranted."

*United States v. Aguilar–Pena,* 887 F.2d 347, 49–51 (1st Cir.1989) (citations omitted).

In the present case, the applicable guideline is the same guideline that applies to offenses under 31 U.S.C. §§ 5313, 5314, 5316, and 5324. Willful violation of any of these statutes is provided for in § 5322. The guideline "linguistically" applies to this case:

**§ 2S1.3.** *Failure to Report Monetary Transactions: Structuring Transactions to Evade Reporting Requirements*

(a) Base Offense Level:

(1) 13, if the defendant:

(A) structured the transactions to evade reporting requirements;

(B) made false statements to conceal or disguise the activity; or

(C) reasonably should have believed that the funds were the proceeds of criminal activity;

(2) 5, otherwise.

(b) Specific Offense Characteristics:

(1) If the defendant knew or believed that the funds were criminally derived, increase by 5 levels.

(2) If the base offense level is from (a)(1) above and the value of the funds exceeded $100,000, increase the offense level as specified in § 2S1.1(b)(2).

U.S.S.G. § 2S1.3.

Under these guidelines the base offense level for structuring will never be less than 13. This would be the same base offense level for a banker who with a specific intent to violate the law fails to file a CTR on a customer whose funds the banker should have believed were tainted.

Assuming that in both situations the defendants know that the money they are dealing with is legitimate, under the literal terms of the guidelines, a banker who knows that it is illegal to neglect to file a CTR, but does not will have a base level of 5, but a person who does not know structuring is illegal and structures will have a base level of 13.

This cannot be the drafters' intent. The drafters of the guidelines seem to make the same assumptions that the drafters of the statute and the *Scanio* opinion do, that those involved in structuring are automatically involved in other criminal activity. The commentary of the guideline "may provide background information including factors considered in promulgating the guideline or reasons underlying promulgation of the guideline.... such commentary may provide guidance in assessing the reasonableness of any departure from the guidelines." Guidelines § 1B1.7. The commentary of the guideline applicable to this case suggests that the drafters did not contemplate persons structuring currency transactions derived from legitimate sources:

The base offense level is set at 13 in the great majority of cases. However, the base offense level is **set at 5 for those cases in which in which these offenses may be committed with innocent motives *and* the defendants reasonably believed that the funds were from legitimate sources.** The higher base offense level applies in all other cases. The offense level is increased by 5 levels if the defendant knew that the funds were criminally derived.

The dollar value ... is an indicator of several factors that are pertinent to the sentence **including the size of the criminal enterprise, and the extent to which the defendant aided the criminal enterprise.**

U.S.S.G. § 2S1.3, comment (backg'nd) (emphasis added).

The first paragraph shows that the drafters did not contemplate a person falling into category § 2S1.3(a)(1) and still having an innocent motive and knowing as Mr. Mento did that the money came from a legitimate source. The commentary includes such persons in category § 2S1.3(a)(2)—giving them a base offense level of 5—even though anyone involved in structuring will fall under § 2S1.3(a)(1)(A) and thus will receive a base offense level of 13.

The second paragraph belies a similar assumption on the part of the drafters of the guidelines. The only persons who will receive an increase in offense level due to the value of the funds involved under § 2S1.3(b)(2) are those who receive a base offense level of 13 under the terms of § 2S1.3(a)(1) including those who structure their transactions under § 2S1.3(a)(1)(A). The comment concerning the significance of the dollar value shows that the commission assumed that anyone involved in § 2S1.3(a)(1) offenses would be involved in some sort of criminal activity.

The Sentencing Commission seems to have felt that persons such as Mr. Mento and Mr. Aversa would not be prosecuted

for structuring. Common sense dictates that they would not. Unfortunately common sense did not dictate the decisions of the United States Attorney in this case. Therefore, this court departed downward.

The record will show that this court has great concern with what transpired just prior to the indictment of the defendants in this case. The court has reference to the Prosecutor Patrick Walsh and the IRS Agent Clifford Hatem with regard to various questions and interviews with the defendants one on one, and both of them together. Of particular concern is the fact that the Prosecutor, after interviewing the defendants, indicted them and then was the prosecuting attorney during the course of the trial. At one point in the trial Defendant Mento made a comment to the Prosecutor Patrick Walsh that he, Walsh knew what was said during the course of the meeting. Fortunately, Attorney Walsh made no comment so there was no possibility of a mistrial. The court will, if the Appellate Court deems it necessary, convene a hearing whereby testimony will be elicited from Attorney Walsh, Agent Hatem and Defendants Aversa and Mento under oath concerning these interviews in June, 1990.