UNITED STATES of America,
Plaintiff–Appellee,

v.

Waldemar RATZLAF, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Loretta RATZLAF, Defendant–Appellant.

Nos. 91–10392, 10429.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1992.

Decided Oct. 6, 1992.

Kevin O'Connell, O'Connell, Goyak & DiLorenzo, Portland, Or., and Donald Cavin Hill, Reno, Nev., for defendants-appellants.

Jeffrey B. Setness and William M. Welch, Asst. U.S. Attys., Reno, Nev., for plaintiff-appellee.

Before: WALLACE, Chief Judge, and CHOY and POOLE, Circuit Judges.

POOLE, Circuit Judge:

Defendants Loretta and Waldemar Ratzlaf appeal their convictions for structuring financial transactions to avoid currency reporting requirements, a violation of 31 U.S.C. §§ 5322(a), 5324(3). They argue that *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), overrules our holding in *United States v. Hoyland*, 914 F.2d 1125 (9th Cir.1990), that the government does not have to prove that the defendants knew structuring is illegal to convict. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

I

Defendants Waldemar and Loretta Ratzlaf, residents of Portland, Oregon, are gamblers. To facilitate their enjoyment of such activity, they established lines of credit at fifteen casinos in New Jersey and Nevada. Mr. Ratzlaf, a regular customer and a "high roller" at the casinos, bet, won, and lost large amounts of money. The events that led to this case began on October 20th, 1988, at the High Sierra casino in Reno, Nevada. Mr. Ratzlaf had a bad night, losing $160,000 playing blackjack. Fortunately for him, the casino had increased his credit line from $25,000 to $160,000 earlier that day. When the casino learned about Lady Luck's unkind treatment of Mr. Ratzlaf, it granted him one week to pay back the $160,000 balance.

On October 27, 1988, the Ratzlafs returned to the High Sierra casino carrying enough cash to pay their debt. Shift manager Tony Mercurio informed his boss, casino Vice-President Stephen Allmaras, that Mr. Ratzlaf did not want the casino to fill out any written report of the payment transaction. Allmaras refused to accept cash payment on those terms and informed the Ratzlafs that he would be required to fill out a "currency transaction report" (CTR) since more than $10,000 in currency was involved. Allmaras told Mr. Ratzlaf that he would be happy to accept as an alternative a single cashiers check for the amount due and suggested to Mr. Ratzlaf that he contact his bank in Oregon to make the necessary arrangements. Allmaras also made available to the Ratzlafs a limousine and assigned employee Ron Hunt to transport them to the local bank that would provide the check.

On October 28, 1988, Hunt escorted the Ratzlafs to several banks in and near Stateline, Nevada and South Lake Tahoe, California. At each bank the Ratzlafs used cash to purchase, or attempt to purchase, cashiers checks in amounts less than $10,000. Armed with the cashiers checks thus obtained, the Ratzlafs returned to the High Sierra casino and submitted them as partial payment on their gambling debt. However, not all of the $160,000 debt was elimi-

nated. Accordingly, on November 28, 1988, Mr. Ratzlaf gave Ruby Langston, a former employee at a restaurant owned by the Ratzlafs, $5,000 in currency and asked her to purchase a single cashiers check for that amount. Langston purchased the cashiers check at First Interstate Bank in Portland. On the same day Mr. Ratzlaf also gave Lena Koseniensky $5,000 in currency and asked her to perform a similar errand. Koseniensky did so at the same bank Langston had visited. Two days later, Mr. Ratzlaf gave George Chanouzas $7,500 in cash and asked him to buy a single cashiers check. Chanouzas also performed this transaction at the First Interstate Bank in Portland. Between November 29 and December 5, 1988, the Ratzlafs separately and together used currency to purchase five cashiers checks, each in amounts less than $10,000, from two other Portland banks.

When asked by IRS investigators why they had paid for the cashiers checks with cash, the Ratzlafs asserted that the money was gambling proceeds and that the High Sierra casino asked them to "pay off the marker" with cashiers checks. Mrs. Ratzlaf also stated that the casino management instructed them to purchase cashiers checks in small amounts so that the casino would not be required to complete a CTR. Mr. Ratzlaf testified at trial that the couple kept gambling winnings and cash revenues from their restaurant hidden in a piece of furniture in their bedroom. Allmaras denied suggesting to the Ratzlafs that they visit various banks and purchase cashiers checks in amounts less than $10,000.

On November 20, 1990 a federal grand jury indicted the Ratzlafs and Hunt. The trio was charged with (1) conspiracy to structure and assist in structuring financial transactions for the purpose of evading reporting requirements; (2) four counts of structuring currency transactions to evade reporting requirements; and (3) interstate travel in aid of racketeering. At trial, the district judge instructed the jury as follows on the structuring charges:

The essential elements required to be proven beyond a reasonable doubt ... are as follows:

First: The defendants had knowledge of a financial institution's duty to report currency transactions in excess of $10,000;

Second: With such knowledge, the defendants knowingly and willfully structured or assisted in structuring or attempted to structure or assist in structuring a currency transaction;

Third: The purpose of the structured transaction was to evade the transaction reporting requirement;

Fourth: The structured transaction(s) involved one or more domestic financial institutions.

. . . .

An act is done knowingly and willfully for the purpose of [31 U.S.C. §§ 5322(a), 5324(3)] if the defendants, with knowledge of a financial institution's duty to report currency transactions in excess or $10,000, voluntarily or intentionally structured or assisted in structuring or attempted to structure or assist in structuring a currency transaction with the purpose of evading the currency reporting requirements.

The government does not have to prove that the defendants knew that structuring was unlawful[,] nor does the government have to prove that the defendants knew of the existence of the law which they are charged with breaking. . . . However, if a defendant did not have knowledge of a bank's duty to report currency transactions in excess or $10,000, that may be considered a defense.

It is not a defense that the defendants did not know that "structuring" itself is [illegal] or of the existence of [31 U.S.C. §§ 5322(a), 5324(3)].

The jury convicted Mr. Ratzlaf on all counts and Mrs. Ratzlaf on the conspiracy and interstate travel charges.[1] Mr. Ratzlaf was sentenced to fifteen months in federal prison on each count, to run concurrently;

---

1. Hunt was convicted on the conspiracy count, two structuring counts, and the interstate travel charge. His convictions are not at issue in this appeal.

three years supervised release; and to pay a fine of $26,300 and a special assessment of $300. Mrs. Ratzlaf was sentenced to five years probation on each count, to run concurrently and to include ten months home detention, and to pay a $7,900 fine and a $100 special assessment. The defendants filed timely notices of appeal on July 10 and August 14, 1991.

## II

We review de novo the question whether the jury instructions in this case misstated the elements of the crime of structuring financial transactions to avoid the currency reporting requirements. *United States v. Durham*, 941 F.2d 886, 890 (9th Cir.1991). "We review a claim of error in a jury instruction by looking to 'the adequacy of the entire charge ... in the context of the whole trial.'" *United States v. Mundi*, 892 F.2d 817, 818 (9th Cir.1989), *cert. denied*, —— U.S. ——, 111 S.Ct. 1072, 112 L.Ed.2d 1178 (1991) (quoting *United States v. Marabelles*, 724 F.2d 1374, 1382 (9th Cir.1984)).

## III

31 U.S.C. § 5324 provides:

No person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction—

. . . . .

(3) structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions.

Individuals that engage in such "structuring" activities are subject to criminal penalties. 31 U.S.C. § 5322(a) ("A person *willfully* violating this subchapter or a regulation prescribed [there]under ... shall be fined ....or imprison[ed] ... or both.") (emphasis added).[2]

■ We recently rejected an argument that an individual cannot be convicted of "structuring" unless the government proves that he or she knew such activities are illegal:

Congress had set the reporting requirement for the banks. Congress was aware that several circuits, including ours, had held it no crime to structure deposits so that the reporting requirement would not be triggered. Congress changed the law to make it a crime so to structure with the intent to prevent reporting. To act willfully under the statute is to act with this intent....

*United States v. Hoyland*, 914 F.2d 1125, 1129–30 (9th Cir.1990) (internal statutory citations omitted). In so holding, we agreed with *United States v. Scanio*, 900 F.2d 485 (2d Cir.1990). There, the Second Circuit concluded that knowledge of illegality is not required to convict for "structuring" because such conduct is "affirmative" and "demonstrate[s] an awareness of the legal framework relative to currency transactions which, it is reasonable to conclude, should ... alert[ ] [the defendant] to the consequences of his conduct." *Id.* at 490 (citing *United States v. Int'l Minerals & Chem. Corp.*, 402 U.S. 558, 564–65, 91 S.Ct. 1697, 1701, 29 L.Ed.2d 178 (1971), and *United States v. Fierros*, 692 F.2d 1291, 1295 (9th Cir.), *cert. denied*, 462 U.S. 1120,

**2.** The Bank Secrecy Act of 1970, 31 U.S.C. § 5313(a), and associated regulations promulgated under its authority, 31 C.F.R. § 103.-22(a)(1), obligate financial institutions to report to the government currency transactions involving more than $10,000. Congress enacted this law because individuals involved in criminal activity frequently engage in sizeable cash transactions. The reports, called "Currency Transaction Reports" or "CTRs," help law enforcement officers investigate and fight a variety of criminal activity. *See generally* H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.C.C.A.N. 4394, 4396; Rusch, *Hue and Cry in the Counting-House: Some Observations on the*

*Bank Secrecy Act*, 37 Cath.U.L.Rev. 465, 469–73 (1988).

The Bank Secrecy Act did not apply to bank customers prior to January 1987. Before that time individuals who "structured" transactions to avoid the $10,000 reporting threshold could be prosecuted only for willfully causing a financial institution to fail to file a CTR, 18 U.S.C. § 2(b), for knowingly and willfully concealing a material fact from the government, 18 U.S.C. § 1001, or for conspiracy, 18 U.S.C. § 371. *United States v. Scanio*, 900 F.2d 485, 488 (2d Cir.1990). As part of the Anti–Drug Abuse Act of 1986, Congress enacted 31 U.S.C. § 5324.

103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983)). The court explained that, unlike other sections of the Bank Secrecy Act,[3] the purpose of section 5324(3) is to protect the government's right to information. To require proof that the defendant knew structuring to be illegal would be inconsistent with this goal. 900 F.2d at 491. *See also United States v. 316 Units of Municipal Securities,* 725 F.Supp. 172, 177–79 (S.D.N.Y. 1989) (civil forfeiture action).

The Ratzlafs argue that the Supreme Court's recent decision in *Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), overrules *Hoyland* and *Scanio. Cheek* was a criminal tax case. The defendant had been charged with willfully attempting to evade income taxes and with willfully failing to file tax returns, violations of 26 U.S.C. §§ 7201 and 7203. The Court held that willfully means the " 'voluntary, intentional violation of a known legal duty.' " 498 U.S. at 197, 111 S.Ct. at 610 (citation omitted) (applying and discussing *United States v. Murdock,* 290 U.S. 389, 396, 54 S.Ct. 223, 226, 78 L.Ed. 381 (1933); *United States v. Bishop,* 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973); and *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976) (per curiam)).

The Court explained its holding with reference to the tax laws:

Willfulness, as construed by our prior decisions *in criminal tax cases,* requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.... [If] the issue is whether the defendant knew of the duty purportedly imposed by the ... statute ... he is accused of violating, ... the Government [satisfies the knowledge component of the willfulness requirement if it] proves actual knowledge of the pertinent legal duty.... But carrying this burden requires negating a defendant's claim of ignorance of the

law.... This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, ... or believe that the duty does not exist.

*Id.* 498 U.S. at 196, 111 S.Ct. at 610–11 (emphasis added).

The Court explained that Congress employed the term "willfully" in the criminal tax laws because their *"proliferation ...* has sometimes made it difficult for the average citizen to *know and comprehend the extent of [their] duties and obligations"* under the tax laws. *Id.* 498 U.S. at 195, 111 S.Ct. at 609 (emphasis added). The Court noted that it had long construed "willfully" in the criminal tax statutes "as carving out an exception to the traditional rule" that "every person kn[ows] the law." *Id.* The Court does this, according to the *Cheek* majority, because the tax laws are "complex[ ]." *Id.*

■ Four federal courts have answered the question whether *Cheek* requires the government to prove a structuring defendant knew that such activity is illegal. In *United States v. Dashney,* 937 F.2d 532 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991), the court rejected the notion that *Cheek* changes the *Hoyland* and *Scanio* conclusions:

Criminal tax statutes are more analogous to ... international currency reporting statutes ..., since entirely innocent actions can lead to violations of the law. [But] Dashney's actions were anything but innocent, as he went to great lengths to avoid the filling out of CTRs in connection with his transactions.

*Id.* at 540 (internal citations omitted). *See also United States v. Nall,* 949 F.2d 301, 307 (10th Cir.1991). In *United States v. Rogers,* 962 F.2d 342 (4th Cir.1992), the court agreed with *Dashney,* holding that the *Cheek* exception is a narrow one. The court emphasized that *Cheek*'s rationale is inapplicable to the structuring statute because it is not complex. *Id.* at 344. *See also United States v. Wollman,* 945 F.2d

---

**3.** Specifically, the court addressed the distinction between "willful" as used in section 5324(3) and as employed in 31 U.S.C. § 5316, which proscribes an individual's failure to file "Curren-

cy and Monetary Instrument Reports." The *Scanio* court explained that section 5316 "requires individuals to report otherwise innocent transactions...." 900 F.2d at 491.

79, 81 (4th Cir.1991) (per curiam) (summarily affirming structuring conviction without addressing *Cheek* ). Similarly, in *United States v. Brown,* 954 F.2d 1563 (11th Cir. 1992), the court refused to apply the *Cheek* exception to section 5324(3). "[Congress'] intent to facilitate prosecution of money launderers, stands in direct contrast to the . . . holding in *Cheek* that Congress intended to show special deference to Tax Code violators, [because] the tax laws [are complex]." *Id.* at 1569 n. 2. *Cf. United States v. Donovan,* 1992 WL 18217, at *4, 1992 U.S.App. LEXIS 1535, *7–*9 (1st Cir., Feb. 6, 1992) (rejecting argument that *Cheek* requires proof of knowledge that failure to report currency transactions exceeding $10,000 is illegal and declaring that "the *Cheek* exception is restricted to tax crimes").

The result was different in *United States v. Aversa,* 762 F.Supp. 441 (D.N.H. 1991). There, the defendants were convicted of structuring after one of the men, Aversa, asked his investment partner and co-defendant Mento to help him conceal proceeds of a legal real estate transaction from his wife, with whom Aversa was engaged in a contentious divorce battle. Aversa asked Mento to allow him to deposit his portion of the real estate revenues in Mento's account and agreed to sign a letter to the IRS stating that the money deposited in Mento's account belonged to Aversa and that Aversa deposited less than $10,000 at a time to avoid arousing IRS suspicion of his income sources and level. The letter was provided to the IRS, and Aversa subsequently engaged in transactions involving less than $10,000 on several occasions.

The New Hampshire district court ruled that Aversa could not be convicted of structuring because he did not know that structuring is illegal. The court reached this conclusion for three reasons. First, structuring can be "innocent" behavior in the sense that no concealment of illegal activity is intended or effected. 762 F.Supp. at 446. Second, the court rejected the *Scanio/Hoyland* definition of "willful" because it means that there would be no difference between the proscribed "willful" violations

of section 5324 and non-willful violations of section 5324. *Id.* at 447–48. Finally, the court believed that *Cheek*'s reasoning applied because "[w]hile § 5322(a) may not be technically a criminal *tax* law it is certainly a criminal law related to taxation." *Id.* at 447 (emphasis in original). In addition, the court was convinced that the structuring laws are just as complex and "obscure" to the average citizen as are the tax laws. 762 F.Supp. at 447.

We disagree with the *Aversa* court for several reasons. First, the currency structuring and reporting statutes are not "complex" in the sense that the *Cheek* Court used that term in referring to the Internal Revenue Code. The tax laws are "[o]ne of the most esoteric areas of the law . . .[,] replete with 'full-grown intricacies', [where] it is rare that a 'simple, direct statement of the law can be made without caveat.'" *United States v. Regan,* 937 F.2d 823, 827 (2d Cir.) (citation omitted), *modified,* 946 F.2d 188 (1991). The tax code's lengthy and complicated list of income sources that are and are not taxable and the conditions under which exemptions and deductions apply are in stark contrast to the *two* things outlawed by the money laundering statutes: failure of a financial institution to report transactions that exceed $10,000; and attempts, successful or unsuccessful, to prevent financial institutions from making the required reports by intentionally avoiding the $10,000 threshold in banking transactions.

Second, we do not think the rule of lenity applies to the money laundering statutes. *Mens rea* is generally required to convict a person for a crime, and where a statute does not clearly specify the mental state required for conviction, courts construe the ambiguity in favor of the defendant. *See United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978); *Rewis v. United States,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971). But the language and history of the structuring statute is not ambiguous, and even a "strict" reading of the statute *supports,* not undercuts, the government's proffered

interpretation.[4]   *Compare Liparota v. United States*, 471 U.S. 419, 424–25 & n. 7, 105 S.Ct. 2084, 2087–88 & n. 7, 85 L.Ed.2d 434 (1985) (noting ambiguity in statute where unclear whether "knowingly" applied to all elements of the offense).

*Hoyland* and *Scanio* rest firmly upon Congress' intent in proscribing structuring. Before the enactment of section 5324(3), several courts, including this one, rejected attempts to impose any criminal liability for structuring financial transactions to avoid reporting requirements.[5]   In 1986, Congress decided to close this apparent loophole in the government's information gathering scheme. *See Scanio*, 900 F.2d at 488 (citing S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986); H.R.Rep. No. 746, 99th Cong., 2d Sess. 18–20 (1986)); *Hoyland*, 914 F.2d at 1129; *Dashney*, 937 F.2d at 537–38.   When Congress effected this amendment to the money laundering and currency reporting statutes, it did not change the language of section 5322(a).   In adding section 5324(3), Congress likewise did *not* specify that a greater "state of

mind" would be required to secure a conviction under it than that established by section 5322.   Thus, after the 1986 amendments, one could be prosecuted for violating section 5324(3) if he or she "willfully" structured transactions.[6]

The legislative history of the Anti–Drug Abuse Act clearly indicates that this interpretation of Congressional intent is correct:

> [A] person who converts $18,000 in currency to cashiers checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the specific intent that the participating bank or banks not be required to file [CTRs] for those transactions, would be subject to potential civil and criminal liability.   A person conducting the same transactions for any other reasons … would not be subject to liability under the proposed amendment.

S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986) (quoted in *Dashney*, 937 F.2d at 538).[7]

---

**4.** *Morissette v. United States*, 342 U.S. 246, 261–63, 72 S.Ct. 240, 248–49, 96 L.Ed. 288 (1952), casts no doubt on this proposition.   There, the Court held that, as a general rule, *mens rea* must be assumed a requirement to convict under a statute that codifies a common law crime.   Structuring, however, was not a criminal offense at common law.   *Hoyland*, 914 F.2d at 1129.

**5.** *See, e.g., United States v. Varbel*, 780 F.2d 758, 762 (9th Cir.1986); *United States v. Anzalone*, 766 F.2d 676, 679–83 (1st Cir.1985).   *But see, e.g., United States v. Tobon–Builes*, 706 F.2d 1092, 1096–1101 (11th Cir.1983).

**6.** Congress' decision to add section 5324(3) to the United States Code also did not modify the traditional meaning of "willfulness," *viz.,* the defendant intended to do the act with which he is charged.   *See Scanio*, 900 F.2d at 489 ("A requirement that the conduct be willful generally means no more than that the person charged with the duty knows what he is doing.   It does not mean that, in addition, he must suppose he is breaking the law.") (quoting *American Surety Co. v. Sullivan*, 7 F.2d 605, 606 (2d Cir.1925) (L. Hand, J.)).

**7.** There is little indication that this interpretation of section 5324(3)'s history and purpose is incorrect.   One report on the Anti–Drug Abuse Act included a proposal to change "willfully" in section 5322 to "knowingly."   H.R.Rep. No. 855, 99th Cong., 2d Sess. 7, 27 (1986) (Report of

House Judiciary Committee).   The report noted that the term "willfully" has been ascribed different meanings in different statutory contexts and explained that its meaning in the money laundering statutes was an "actual awareness of the reporting requirement.…"   *Id.* at 21–22. The Judiciary Committee Report recommended a change to the word "knowingly," explaining that this change would not be intended to change the meaning of the statute.   *Id.*   The House Committee on Banking, Finance and Urban Affairs issued a report similar to that of the Judiciary Committee.   H.R.Rep. No. 746, 99th Cong., 2d Sess. 29 (1986).   It stated that "[i]n the criminal context the term "knowingly" means with specific intent to commit a violation of the … Act" or "specific intent to commit a crime." *Id.* at 41.   The report also suggested a change to the term "knowingly."

We agree with the Tenth Circuit that these committee reports are not helpful.   First, the legislation discussed in the Judiciary Committee Report did not contain any prohibition of structuring.   *Dashney*, 937 F.2d at 537 n. 5.   That means the Committee was not contemplating the appropriate state of mind when it was considering structuring.   Second, the reports were submitted with bills rejected by Congress. Thus, although Congress did ultimately make changes in the money laundering laws, "it is [not] reasonable to assume that [Congress] adopted the intent of the[se] committee[s]," *Sutherland's Statutory Construction* § 48.06, at 332 (5th ed.).

The *Aversa* court's premise—that a defendant must know of the *reporting requirements* to be convicted of structuring—is therefore correct, but does not support the holding of that case. If a defendant knows that the bank must report a currency transaction and then intentionally acts in a way to prevent that, he has acted "willfully." One does not act "willfully" under section 5322 unless *both* parts of this equation are present. *See Dashney,* 937 F.2d at 539. There is no danger that someone who does *not* know of the reporting requirements could be convicted under that *mens rea* standard; nor is there any way that one who knows of the reporting requirements but who *does not intend* to prevent such reporting can be convicted of structuring. No one can be convicted of "violating" section 5324(3) unless he or she knows of the reporting requirements *and* that he or she is doing something to prevent such reporting.

Finally, this case presents little risk that persons who engaged in "innocent" actions stand unjustly convicted of structuring. The Ratzlafs were aware of the reporting requirements, and the evidence indicates that the Ratzlafs apparently were seeking to avoid payment of their income taxes. The couple took no steps to insure that the IRS would be aware of the assets used to purchase the cashiers checks; denied that they earned money from gambling when in fact they had done so; denied any failure to report gambling income; and apparently hid large amounts of currency in or near their home. The Ratzlafs cannot be compared to an individual involved in perfectly ordinary business transactions who unconsciously breaks the currency laws. *Compare Aversa,* 762 F.Supp. at 446.

## IV

*Cheek* did not overrule *Hoyland.* We join the Fourth, Tenth, and Eleventh Circuits in reaching this holding. Accordingly, the instructions given by the district court were not improper. The defendants' convictions are therefore AFFIRMED.