**UNITED STATES of America, Plaintiff,**

v.

**Billy Logan SPEER, Defendant.**

**Crim. A. No. CR92–00031–BG(H).**

United States District Court,
W.D. Kentucky,
Bowling Green Division.

June 11, 1993.

James R. Lesousky, Asst. U.S. Atty., Louisville, KY, for plaintiff.

David F. Broderick, Broderick, Thornton & Pierce, Bowling Green, KY, for defendant.

### MEMORANDUM OPINION

HEYBURN, District Judge.

In this case the Court is called upon to determine the state of mind that Congress required when it enacted 31 U.S.C. § 5324 as an amendment to the Bank Records and Foreign Transactions Act.[1] For the reasons set forth herein, the Court concludes that a conviction for violation of 31 U.S.C. § 5324 requires a jury finding that the defendant knew that "structuring" is unlawful. Because the Sixth Circuit has not addressed this issue directly and because this Court's conclusion is contrary to the majority of those circuits which have considered the issue, the Court is setting forth its reasoning in this Memorandum Opinion.

### I.

Defendant, Billy Logan Speer, was charged in Count 1 of the Indictment with structuring a series of currency transactions to avoid the currency transaction reporting requirements of 31 U.S.C. § 5313(a), in violation of 31 U.S.C. § 5324(a)(3).

Speer is a self-styled inventor and businessman. He obtained formal schooling only through the 8th grade. He is now in his sixties. Speer testified that he often conducted business in cash or by cashier's check and the evidence provided some support for that statement. Defendant also brought forward testimony that it was common practice for persons to conduct their banking activities with cash and cashier's checks.

---

1. Congress passed the Money Laundering Act of 1986 as part of the Anti–Drug Abuse Act of 1986. Part of that Act amended Subchapter II of the Bank Records and Foreign Transactions Act (the Bank Secrecy Act provisions) by adding the antistructuring provision codified at 31 U.S.C. § 5324.

At trial the proof showed that between March 8–10, 1988, Speer purchased nine (9) separate $9,000 cashier's checks at six different banks in three cities. He used the cashier's checks, plus two other cashier's checks bought in 1985, to purchase a paid-up $250,000 life insurance policy. There was no suggestion that the life insurance purchase was part of some unlawful scheme or that the purchase was otherwise suspicious.

Prior to trial the United States asserted that at the time of the March, 1988 transactions, Speer owed the IRS $52,000 in back taxes and that he had received a final discharge in bankruptcy less than one year before the currency transactions. However, there was no evidence whatsoever that the IRS was attempting to collect the $52,000 from Speer individually, because in fact, the IRS had previously negotiated a repayment plan with the corporate primary debtor. Pursuant to the payment plan, the corporate debtor ultimately paid its IRS assessment of taxes, penalties and interest. None of this evidence was admitted at the trial.

Moreover, the United States could not produce evidence that the $81,000 in cash came from funds which were not disclosed in the bankruptcy proceedings. Although Speer did not appear to have a sophisticated understanding of business or finance, his business ventures were successful enough that in recent years Speer regularly earned between $50,000 and $150,000 annually. In other words, absent evidence to the contrary, there was every reason to believe that regular income was the source of the cash funds used to purchase the cashier's checks. Since there was no evidence that Speer had reason to hide the transactions from the bankruptcy officials, the Court found that it was not relevant and admissible evidence at trial.

At trial, the United States produced no evidence to explain why Speer might want to hide the transactions. There was no suggestion that Speer obtained the funds from drug transactions nor was there suggestion that he sought to evade payment of taxes. One witness testified about a conversation overheard between Speer and a non-testifying third person during which Speer was told about the transaction reporting requirement. While no direct evidence supported the conclusion that Speer had knowledge that it was unlawful to "structure" transactions, such knowledge could be inferred from the circumstantial evidence of the transactions themselves.

A two day trial concluded with the Court issuing jury instructions requiring proof that Speer "knew" that structuring was illegal.[2]

---

2. The instructions, in pertinent part, by which the court charged the jury are as follows:

The indictment charged the defendant with violating Title 31, United States Code, Section 5324(3), which prohibits persons from willfully structuring any transaction with one or more domestic financial institutions for the purpose of evading the reporting requirement of Section 5313(a).

A person structures a transaction if that person conducts one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the currency reporting requirements under Title 31, United States Code, Section 5313(a).

"In any manner" includes, but is not limited to breaking down a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000. A transaction or transactions, however, need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

Title 31, United States Code, Section 5324(3) makes it a federal crime or offense for anyone to knowingly structure a series of currency transactions for the purposes of evading the currency reporting requirements under 31 U.S.C. Section 5313(a).

In order for Billy Speer to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:

(1) That Billy Speer knew that banks were obligated to report certain currency transactions;

(2) That Billy Speer knowingly and willfully structured a currency transaction or series of currency transactions;

(3) That Billy Speer's purpose in structuring a transaction or any series of transactions was to evade the currency reporting requirements under 31 U.S.C. Section 5313(a); and

(4) That Billy Speer knew that structuring is unlawful.

The word "knowingly" or "knew," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident. It is permissible to infer such "knowledge", if you so find, from the facts and circumstances surrounding the transactions or it is also permissible to infer, if you so find, the absence of such "knowledge."

Thereafter, the jury completed its deliberations and returned a verdict of not guilty on the charges contained in Count I of the Indictment.

## II.

Five circuits have held that to obtain a conviction under 31 U.S.C. § 5324, the Government need not prove that a defendant specifically knew that "structuring" is unlawful.[3] In these circuits, therefore, mistake of law—the absence of knowledge that structuring is illegal—is not a defense. The *mens rea* requirement for a structuring violation in these circuits is twofold: the Government must prove both knowledge of the reporting requirement and an intent to evade that requirement by means of structuring. The Government need not prove knowledge of the illegality of structuring, because this knowledge may be inferred from the act of structuring itself, which "demonstrate[s] an awareness of the legal framework relative to currency transactions." *United States v. Scanio*, 900 F.2d 485, 490 (2d Cir.1990).

Recently, in an *en banc* decision, the First Circuit rejected this rationale, and persuasively held that the Government must prove either knowledge that structuring is illegal or reckless disregard of that knowledge—thus, adding another element to the *mens rea* requirement. *United States v. Aversa*, 984 F.2d 493, 498 (1st Cir.1993). The *Aversa* court held that "willful," the *mens rea* language of 31 U.S.C. § 5322, applies "in equal measure to both CTR violations and structuring offenses." *Id.* at 499. To justify its rejection of the majority of the circuits' interpretation of the *mens rea* for structuring violations, the First Circuit stressed two factors: the need for uniformity in the interpretation of "willful" to allow a good faith mistake of law defense, and the notion that the "reckless disregard" element lessens this decision's impact on the government's ability to obtain a conviction.[4]

The three opinions of *Aversa*—the majority, the concurrence, and the dissent—differ mainly in their respective interpretations of *Cheek v. United States*, 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). By including the element of reckless disregard, the majority rejected the purely subjective standard of *mens rea* found in *Cheek*.[5] The majority did, however, adopt the *Cheek* Court's underlying rationale by concluding that when an act is not inherently criminal in nature, it is appropriate that knowledge of its illegality should be an element of the offense in order to avoid punishing innocent mistakes of law. 984 F.2d at 502.

Unlike the majority, the concurring opinion in *Aversa* suggested that *Cheek*'s subjective *mens rea* standard should apply to structuring violations, because, like tax law violations, they penalize conduct which is not inherently criminal.[6] The concurrence con-

---

The word "willfully," as that term has been used from time to time in these instructions, means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is with bad purpose either to disobey or disregard the currency transaction reporting requirements.

3. *United States v. Scanio*, 900 F.2d 485, 490 (2d Cir.1990); *United States v. Dashney*, 937 F.2d 532, 540 (10th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991); *United States v. Rogers*, 962 F.2d 342, 344 (4th Cir. 1992); *United States v. Ratzlaf*, 976 F.2d 1280, 1282 (9th Cir.1992), *cert. granted,* — U.S. —, 113 S.Ct. 1942, 123 L.Ed.2d 648 (1993); *United States v. Brown*, 954 F.2d 1563, 1568 (11th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 284, 121 L.Ed.2d 210 (1993).

4. The *Aversa* court stated that its approach "provides a fair, workable, mistake-of-law defense ...

and at the same time ensures that defendants who know of the law's requirements in a general sense, but recklessly or intentionally fail to investigate the legality of structuring or other proscribed activity, will be found guilty." 984 F.2d at 499.

5. The majority concluded that the rationale for the *Cheek* standard—that the complexity of the tax laws justifies a liberal mistake of law defense—did not apply to the currency statutes, because they affect fewer people and are much less intricate than the tax codes. *Id.* at 502.

6. "[B]oth sets of laws are technical; and both sets of laws sometimes criminalize conduct that would not strike an ordinary citizen as immoral or likely unlawful. Thus, both sets of laws may lead to the unfair result of criminally prosecuting individuals who subjectively and honestly believe they have not acted criminally." *Id.*

cluded, however, that because the majority's standard protects ordinary citizens who reasonably fail to investigate or have no specific knowledge of the structuring statute, the standard is actually quite close to that of *Cheek.* The concurrence reasoned that the "reckless disregard" element of the mens rea standard applied to those engaged in criminal activity rather than to ordinary citizens, because structuring in furtherance of criminal activity implies knowledge of the statute. 984 F.2d at 503.

Although it did not expressly reject the majority's standard, the dissenting opinion in *Aversa* advocated adopting *Cheek*'s subjective and more stringent *mens rea* standard for structuring violations. The dissent focussed on the legislative history of the Bank Records and Foreign Transaction Act[7] and concluded that it was enacted to facilitate the prosecution of narcotics conspiracies, and to prevent income tax evasion and money laundering. 984 F.2d at 505. The dissent ultimately stated that the Government should always be required to prove specific intent when prosecuting currency violations, because "an unsuspecting common citizen can easily fall prey to this uncommon area of the law." *Id.* at 507.

The Sixth Circuit has not addressed this issue directly. *United States v. Baydoun,* 984 F.2d 175 (6th Cir.1993), stressed the intent to deprive the Government of information about criminal activity as an important element of the *mens rea* for structuring violations. The *Baydoun* court reversed the defendant's conviction because he was neither involved in money laundering nor attempting income tax evasion. *Id.* at 180. Although *Baydoun* did not specifically ad-

dress the issue at hand, the Sixth Circuit's analysis could be read to implicitly reject the view of the other five circuits, because it in fact employed a more stringent *mens rea* standard by examining a defendant's motive to determine his mental state.[8]

### III.

This Court agrees with the *Aversa* majority's statutory analysis, concluding that willfulness is an element of the offense, and with its belief that the *Cheek* logic is persuasive, though *Cheek*'s holding does not apply to currency cases directly. This Court cannot improve upon the majority's research and, therefore, will confine its considerations to the fairness and logic of the conclusions which it has adopted from *Aversa.*

Any deviation from the long-standing principle that ignorance of the law is no excuse evolves first from the simple proposition that due to the complexity of certain statutes, the average citizen cannot know or comprehend the extent of the duties imposed. Just as important, any such deviation may evolve from the certain knowledge that not all activities which may be unlawful are inherently criminal, and that it may be difficult or even impossible for the average citizen to know that a certain activity is criminal. In the case of 31 U.S.C. §§ 5313 and 5324, we consider two separate provisions, neither of which prohibit conduct which the average citizen would consider inherently criminal.

The Court cannot imagine that it is even a reasonable possibility that an average citizen such as Speer might gain knowledge of the currency "structuring" prohibitions which became effective only 14 months prior to the date of Speer's alleged acts.[9] This Court

---

7. Pub.L. No. 91–508, 84 Stat. 1114 (1970) (codified as amended in various sections of 12 U.S.C., 15 U.S.C., and 31 U.S.C.).

8. "[T]he government must prove ... that the defendant sought to deprive the government of the information to which it was entitled by structuring." *Id.* at 180. "There is no evidence in the record that defendant had the intent to deprive the government of anything ..." *Id.* at 181. "In this connection, we find it most significant that at oral argument, counsel for the government conceded that the cash in question was nontaxable and that drug monies were not involved. Thus, it is clear that there was no at-

tempt by defendant Baydoun to engage in money laundering or to evade taxes due the IRS." *Id.* at 181–82.

9. Pub.L. 99–570, 100 Stat. 3207 (1986), codified as 31 U.S.C. § 5324 was passed on October 27, 1986, and became effective in January of 1987. Prior to the enactment of the statute, the majority of Circuits which had addressed the issue held that structuring was lawful. *United States v. Anzalone,* 766 F.2d 676, 679–83 (1st Cir.1985); *United States v. Larson,* 796 F.2d 244, 246 (8th Cir.1986) ("Criminal sanctions should not be imposed for conduct which is not clearly illegal"); *United States v. Varbel,* 780 F.2d 758, 762 (9th

concludes that it is not reasonable to assume that such knowledge could be gained, particularly in view of the general policies which banks seem to have adopted in disclosing these matters to their clients.

Each of the banking officials testifying in this case stated that bank policy prohibited advising customers of the currency transaction report requirement. Nevertheless, a customer sometimes became aware of the reporting upon being advised that additional information was necessary in connection with such a report. If the customer decided not to provide the information or to reduce the transaction below the $10,000 amount, bank policy prohibited advising the customer that "structuring" was unlawful. Consequently, the difficulty that an average citizen might have in obtaining knowledge about such an obscure statute, was compounded by the policies of local banking institutions which cast a further veil of secrecy across these statutes—not that any was needed.

█ The context and background of any statutory enactment is always important not to construe language differently than its unambiguous meaning, but rather to determine the scope of the statute's application and the breadth of its coverage. Sophisticated tax dodgers, drug dealers and other trained professionals may well understand the inherent criminality of arranging transactions so as to evade the bank reporting requirements. To apply this law to this class of persons, which Congress no doubt intended, is imminently fair, within the plain meaning of the statute and within the scope of congressional intent. The same cannot be said for the application of the statute to ordinary citizens.

█ In this case, such an analysis produces a logical conclusion that to require proof of specific *mens rea* would not lessen the statute's effectiveness one iota as a weapon against drug dealers and tax dodgers, Congress' intended targets. In fact, each of the cases in the five-circuit majority can be distinguished from the case at hand. These

cases all involved defendants who structured their transactions in furtherance of a criminal purpose. In each case, there appeared to be overwhelming evidence of criminal intent. The standard articulated today would most likely not alter these outcomes, because it allows the jury to infer knowledge of the structuring statute from the circumstances surrounding the transactions. Thus, this Court's standard would help prevent indiscriminate use of 31 U.S.C. § 5324 against an unintended and criminally innocent class.

The *Aversa* majority concluded that the Government had the option of proving either knowledge that structuring was illegal or that a defendant recklessly disregarded that knowledge. This Court has omitted that option from its jury instructions because it has difficulty understanding how the average person could "recklessly disregard" knowledge of such a specialized statute. Moreover, the Court cannot imagine that proof of such reckless disregard could be different than proof educed to show the defendant's knowledge. The "reckless disregard" standard is logical if applied to trained professionals or others with a reason to know of the statute, but it has questionable application to the guilt or innocence of the average person. This Court simply concludes that the better course is to require "knowledge" as an element of the offense and to allow proof of such knowledge by direct evidence as well as by circumstantial evidence or the facts and circumstances surrounding the transaction. Consequently, this Court's instructions put all the appropriate elements "in play" for the jury to determine whether the defendant has the requisite *mens rea*.

Just as the "reckless disregard" standard of *Aversa* operates to penalize those obviously engaged in criminal conduct,[10] the "permissible inference" element imputes knowledge of the unlawfulness of structuring to those whose actions are patently criminal. Rather than assuming that *mens rea* shall be inferred as a matter of law from the facts

---

Cir.1986); the Fifth Circuit held to the contrary in *United States v. Thompson*, 603 F.2d 1200 (5th Cir.1979), but this case involved a bank officer who told the teller not to file a report when he structured his transactions.

10.   *See United States v. Aversa*, 984 F.2d 493, 502–03 (1st Cir.1993) (Breyer, C.J., concurring).

and circumstances of a transaction, this Court allows the jury to draw such a permissible inference from the evidence. Although critics of more subjective *mens rea* standards argue that they impede the Government's case and reduce convictions,[11] this Court's standard, with its "permissible inference" element, neither hinders the Government nor, more importantly, subjects innocent citizens to prosecution for honest mistakes of law.

This Court wishes to protect persons whose actions are not clearly criminal from prosecution under 31 U.S.C. § 5324(a)(3). On the other hand, those suspected of depriving the Government of financial information as part of a criminal scheme will not escape conviction under this instruction. This Court suggests that its tendered instructions, in addition to following the best and fairest rule of law, have the virtue of coinciding with the normal jury deliberative process. The jury will—and this Court believes properly should—fairly consider the permissible inferences that may be drawn from the facts and circumstances of the transactions to determine whether a defendant's conduct was a criminal act.

The Court submitted instructions to the jury consistent with this Memorandum Opinion.

11.  *See, e.g., Cheek v. United States,* 498 U.S. 192, 209–10, 111 S.Ct. 604, 615, 112 L.Ed.2d 617 (1991) (Blackmun, J., dissenting).