Warren Harding McNAMARA,
Jr., Petitioner,

v.

UNITED STATES of America,
Respondent.

Civ. A. No. 4:94cv58.
Crim. A. No. 4:93cr50.

United States District Court,
E.D. Virginia,
Newport News Division.

Oct. 20, 1994.

Kevin O'Connell, Portland, OR, for petitioner.

Robert Edward Bradenham, II, U.S. Atty's. Office, Norfolk, VA, for respondent.

## MEMORANDUM OPINION AND ORDER

PAYNE, District Judge.

Warren Harding McNamara, Jr., who was convicted of structuring financial transactions to avoid currency reporting requirements in violation of 31 U.S.C. §§ 5324(a)(3), 5322(a) and who did not appeal either his conviction or his sentence, filed a motion, pursuant to 28 U.S.C. § 2255, to vacate, set aside or correct sentence. He advances two grounds for that motion: (1) that he was denied effective assistance of counsel as guaranteed by the Sixth Amendment; and (2) that there has been an intervening change in substantive law which requires reversal of his conviction.

In the alternative, McNamara has filed a motion pursuant to 18 U.S.C. § 3582(c)(2) for reduction of sentence.

McNamara was represented at trial by J. Brian Donnelly, a former Assistant United States Attorney whose represented and advertised areas of specialization included white collar criminal defense. Donnelly and McNamara testified at the evidentiary hearing held on the petition.

## STATEMENT OF FACTS

McNamara, himself an attorney, began the practice of law in Virginia in 1964. The events that led to McNamara's conviction began in 1991 and involved two of McNamara's clients, Robert J. McNally and Jacques G. Panis. McNamara previously had represented McNally setting up corporations for McNally's business ventures and had handled certain payments on behalf of those corporations. McNamara also had handled Panis' divorce.

This criminal prosecution arose out of several transactions in which money to be used to purchase the Moonshadow, a 51–foot yacht, was deposited into the account maintained by McNamara for the escrow of funds held by McNamara as a fiduciary for clients. Between July 29, 1991 and August 30, 1991, McNamara made nine deposits to that account, each ranging from $2,000 to $5,000, in branches of McNamara's bank located in Virginia Beach, Hampton, and James City County. McNally and Panis also made several deposits into McNamara's escrow account, each under $10,000, using deposit slips given to them by McNamara. Over this period in 1991, approximately $60,000 was deposited into the escrow account by McNamara, Panis and McNally.

Also during this time period, McNamara and McNally created a Delaware corporation called "Team Flex." McNamara listed a fictitious person, Rudy Cross, to serve as president of Team Flex and himself as vice-president. Purportedly on behalf of Team Flex, McNamara negotiated the purchase of the Moonshadow. Approximately $60,000 of the purchase price came from McNally and Panis through McNamara's escrow account. McNamara contributed approximately $30,-

000 of his own money toward the purchase price.

In January 1992, McNally and Panis were arrested. Both pled guilty to smuggling nearly 12 tons of marijuana into Virginia between 1985 and 1989. The sentences of McNally and Panis were reduced in return for testimony against McNamara in a prosecution for structuring of financial transactions to avoid reporting requirements involving the deposits discussed above and the purchase of the Moonshadow. According to McNally and Panis, the Moonshadow was to be used to smuggle marijuana into the United States.

On May 11, 1993, McNamara was indicted on two counts: (1) conspiracy in violation of 18 U.S.C. § 371; and (2) structuring of financial transactions to avoid currency reporting requirements in violation of 31 U.S.C. §§ 5324(a)(3), 5322(a).[1] McNally and Panis were the government's principal witnesses against McNamara. Both testified that McNamara had structured the deposits of money into his escrow account in order to avoid currency reporting requirements. Panis also testified that, when representing him in a divorce action, McNamara had advised Panis to pay the $50,000 settlement in six separate checks, each less than $10,000, and to have his wife deposit the checks separately. McNally also testified that he told McNamara that the Moonshadow was to be used for drug smuggling and that McNamara had replied that he "understood."

McNamara's defense consisted principally of his own testimony which was augmented by some character witnesses. The defense was that McNamara, who denied receiving the large cash sums that allegedly came from McNally and Panis, did not engage in any conduct that was structuring. McNamara's defense included testimonial assertions that he did not structure the deposits he made and that he did not know of the existence of the federal reporting requirements for currency transactions.

McNamara was acquitted of the conspiracy count, but convicted of the structuring count. The conduct of his counsel respecting the structuring offense is the linchpin of McNamara's petition. Hence, it bears close scrutiny.

Under 31 U.S.C. § 5324(a)(3), it is a crime for a person to "structure or assist in structuring or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions." 31 U.S.C. § 5324(a)(3). 31 U.S.C. § 5322(a) provides the punishment for a person *"willfully violating* this subchapter or a regulation prescribed under this subchapter ..." 31 U.S.C. § 5322(a) (emphasis added).

The law governing the willfulness element in the Fourth Circuit at the time of trial was set by the decision in *United States v. Rogers,* 962 F.2d 342 (4th Cir.1992) wherein the Court of Appeals held that willfulness required "that the defendant had knowledge of the currency reporting requirements and acted to avoid them," *id.* at 345, but that, because "[n]o other specific intent need be shown ... [Rogers] ... was not entitled to any jury instruction regarding knowledge of illegality." *Id.*

On April 26, 1993, before McNamara was indicted for structuring, the Supreme Court of the United States granted certiorari in *Ratzlaf v. United States,* 976 F.2d 1280 (9th Cir.1992), *cert. granted,* — U.S. ——, 113 S.Ct. 1942, 123 L.Ed.2d 648 (1993). On April 27, 1993, the day after certiorari was granted, United States Law Week reported this fact under the bold headings "Review Granted" and "Criminal Law and Procedure." —— U.S. ——, 113 S.Ct. 1942. United States Law Week described the Ninth Circuit's holding in *Ratzlaf* and printed the following:

---

1. Federal law requires banks and other financial institutions to file reports with the Secretary of the Treasury whenever they are involved in a cash transaction exceeding $10,000. 31 U.S.C. § 5313(a); 31 CFR § 103.22(a) (1993). The verb "to structure" when applied to such transactions means to break up a single transaction that would be above the $10,000 reporting threshold into separate transactions that are each below the threshold. Federal law prohibits the structuring of transactions with domestic financial institutions for the purpose of evading the reporting requirements of § 5313(a). 31 U.S.C. § 5324(a)(3). "A person willfully violating" the antistructuring law is subject to criminal penalties. 31 U.S.C. § 5322(a).

Questions presented: (1) Is knowledge of illegality of one's actions element of criminal offense of structuring cash transactions in violation of Section 5324(3)? (2) Does this court's decision in *In Cheek v. U.S.* apply to section 5324.

*Id. In Cheek v. United States,* 498 U.S. 192, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991), the Supreme Court held that proof of willfulness in criminal tax cases requires a showing that the defendant knew that the conduct at issue was illegal. *Id.* at 200–02, 111 S.Ct. at 610. In *Rogers,* the Fourth Circuit held that the rule in *Cheek* did not apply to structuring cases.

Aware that review had been granted in *Ratzlaf* and bound by *Rogers,* the court charged McNamara's jury on the issue of willfulness by using Instruction No. 29, which was based on *Rogers.* Counsel for the Government and Donnelly agreed to Instruction No. 29 without objection. Neither counsel for the Government nor Donnelly mentioned *Ratzlaf.*

On July 19, 1993, McNamara was acquitted of conspiracy and convicted of structuring. On October 15, 1993, McNamara was sentenced to twenty-one months in prison, three years of supervised release, a $4,000 fine and a $50 special assessment. McNamara did not appeal because, as he testified at the hearing on this petition, he knew of no basis on which to prosecute an appeal.

On January 11, 1994, the Supreme Court decided *Ratzlaf v. United States,* —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) and held that, in order to convict a defendant under 31 U.S.C. §§ 5322(a) and 5324(3), "the jury had to find he knew the structuring in which he engaged was unlawful." *Ratzlaf,* —— U.S. at ——, 114 S.Ct. at 663. This was based on the Court's view that the phrase "willfully violated" signaled Congress' "intent to require for conviction proof that the defendant knew not only of the bank's duty to report cash transactions in excess of $10,000, but also of his duty not to avoid triggering such a report." *Id.* at ——, 114 S.Ct. at 662.

McNamara learned of *Ratzlaf* while in prison and communicated with his current counsel who filed the petition currently under consideration. At an evidentiary hearing,

McNamara testified that Donnelly neither mentioned the pendency of *Ratzlaf* nor raised the absence of knowledge that structuring was illegal as a potential issue in McNamara's defense.

Donnelly testified that, during his representation of McNamara, he was unaware that the Supreme Court had agreed to review *Ratzlaf* or that the First Circuit had adopted a definition of willfulness different than that set by the Fourth Circuit. Donnelly, however, testified that, shortly after undertaking McNamara's representation, he reviewed, as was his usual practice, the annotations in the United States Code respecting elements of the structuring charge. In so doing, Donnelly determined that *Rogers,* which had been decided in 1992, represented the controlling law in this circuit. He did not further pursue the issue.

## DISCUSSION

It is against the foregoing factual record that McNamara's motions must be considered. For the reasons set forth below, the section 2255 motion is granted and the judgment of McNamara's conviction is set aside.

McNamara raises three arguments in support of his ineffective assistance of counsel claim: (1) that Donnelly was ineffective because he was unaware that the *Rogers* willfulness standard was called into question by decisions in other circuits or that the Supreme Court had granted certiorari in *Ratzlaf* to consider the willfulness issue; (2) that Donnelly was ineffective because he failed to interview character witnesses who could have strengthened McNamara's credibility; and (3) that Donnelly was ineffective because he was unaware that, as the consequence of an amendment to the applicable sentencing guidelines, a new guideline carrying a lesser penalty was to take effect on November 1, 1993, shortly after McNamara's scheduled sentencing hearing. At the hearing on this petition, McNamara abandoned the second point. It is not necessary to consider the third point.

In *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the Supreme Court held that to dem-

onstrate the ineffective assistance of counsel, a defendant first must show that counsel's representation was deficient and, then, must establish that the deficient performance prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064. *See also Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1357 (4th Cir.1992); *Jones v. Murray,* 947 F.2d 1106, 1110 (4th Cir.1991) *cert. denied* —— U.S. ——, 112 S.Ct. 1591, 118 L.Ed.2d 308 (1992); *Williams v. Kelly,* 816 F.2d 939 (4th Cir.1987). At bottom, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland,* 466 U.S. at 686, 104 S.Ct. at 2064.

The deficient performance facet of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687, 104 S.Ct. at 2064. *See also Jones,* 947 F.2d at 1110. To satisfy this facet of *Strickland,* the defendant must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064. The standard for deficient performance is "not merely below average performance; rather, the attorney's actions must fall below the wide range of professionally competent performance." *Griffin,* 970 F.2d at 1357. In evaluating counsel's conduct, judicial scrutiny must be "highly deferential." *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

The prejudice facet of the *Strickland* test "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

at 687, 104 S.Ct. at 2064. Accordingly, the defendant must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068.

### The Issue of Deficient Performance

■ McNamara argues that Donnelly's failure to learn of case law in other circuits and of the Supreme Court's decision to grant certiorari in *Ratzlaf* constitutes ineffective assistance of counsel.[2] Notwithstanding the great number of cases asserting ineffective assistance of counsel, relatively few are based upon the alleged insufficiency of legal research. Far more common are challenges to factual research, such as the interviewing of witnesses, or challenges to discretionary decisions that might be characterized as strategic. Nevertheless, in *Strickland* the Supreme Court drew no distinction between the duty to investigate the law and the duty to investigate facts. In that regard, the Court observed

> ... strategic choices made after *thorough investigation of law and facts* relevant to plausible options are virtually unchallengeable; and *strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.* In other words, *counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.* In any ineffectiveness case, *a particular decision not to investigate* must be directly *assessed for reason-*

---

2. This argument, and the next that refers to the Supreme Court's decision to grant certiorari in *Ratzlaf,* both concern Instruction No. 29. The Government contends that the proper means by which to challenge this jury instruction was on direct appeal. McNamara contends that he was prejudiced by Donnelly's failure to challenge to the instruction. The law is clear that "[a] claim of ineffective assistance counsel should be raised by motion under 28 U.S.C. § 2255 in the district court and not on direct appeal, unless it 'conclusively appears' from the record that defense counsel did not provide effective representation." *United States v. Gastiaburo,* 16 F.3d 582, 590 (4th

Cir.) *cert. denied* —— U.S. ——, 115 S.Ct. 102, 130 L.Ed.2d 50 (1994). *See also United States v. Hoyle,* 33 F.3d 415, 418–19 (4th Cir.1994) (ineffective assistance claim should be raised in § 2255 motion rather than on direct appeal); *United States v. Tatum,* 943 F.2d 370, 379 (4th Cir.1991) (competency of counsel best left for collateral review because record usually inadequately developed).

Therefore, the fact that McNamara did not file a direct appeal does not prevent the assertion of an ineffective assistance of counsel claim on collateral review.

*ableness* in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066 (emphasis added). The duty on counsel therefore is to conduct a reasonable investigation of the applicable law and the facts. Here that duty involves investigating the elements of the offense with which McNamara was charged.

McNamara's first attack on his counsel's approach to the willfulness element is that "counsel's incompetent trial performance is based on his failure to recognize the existing case law that questioned the *Rogers* standard." Memorandum in Support of Motion to Vacate at 15. The cases to which McNamara refers as having "questioned the *Rogers* standard" were from courts outside of the Fourth Circuit. *United States v. Aversa,* 984 F.2d 493 (1st Cir.1993); *United States v. Ratzlaf,* 976 F.2d 1280 (9th Cir.1992); *United States v. Speer,* 824 F.Supp. 111 (W.D.Ky. 1993).

■ McNamara's theory must be assessed in perspective of the admonition that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984). *See also Proffitt v. Waldron,* 831 F.2d 1245 (5th Cir.1987) (discussing the "broad duty of attorneys to investigate matters that materially affect their clients' cases"). Also, in *Bunch v. Thompson,* 949 F.2d 1354, 1363 (4th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 3056, 120 L.Ed.2d 922 (1992), the Fourth Circuit held that the reasonableness of the attorney's conduct must be evaluated in light of the practical limitations affecting counsel. Under *Strickland,* "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on the investigation." *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066.

■ In the factual circumstances of this case, the court is not persuaded that, standing alone, the failure to research the law of other circuits constituted deficient conduct. *Rogers* was the law in the Fourth Circuit at the time of trial. It had been recently decided by a unanimous panel and there was no suggestion in any other decision issued by the Fourth Circuit that a change was afoot. Hence, there is no basis to conclude that the time devoted to a survey of the law of all other circuits would have offered any chance of success. On these facts, then, the decision not to investigate the law of other circuits, standing alone, was not unreasonable, notwithstanding that counsel could have chosen to build his case by challenging *Rogers* based on the reasoning of contrary cases in other circuits.

However, McNamara's argument does not end there because it is inextricably linked with the assertion that his counsel was deficient in not ascertaining that the Supreme Court had under consideration whether the *Ratzlaf* standard, which was diametrically opposed to *Rogers,* should become the law of the land respecting an element of a crime with which his client was charged. Thus, notwithstanding that the failure to research the law of other circuits was not deficient *per se,* it is necessary to determine the somewhat related, but conceptually distinct, issue whether a lawyer is deficient in failing to stay abreast of activity before the United States Supreme Court in a field in which he asserts specialized knowledge and expertise.

In the modern environment of law practice, the law changes rapidly and develops in significant ways as a matter of course. One consequence of this modern environment, and of dramatic advancements in technology, is the advent of extensive resources for staying abreast of developments in the law. Numerous legal newspapers, periodicals such as United States Law Week, and on-line services serve this important purpose.

■ The first question then is whether, in this environment, it is outside the wide range of reasonable conduct for a lawyer to fail to utilize some method of keeping up with changes in the law. The court concludes that it is. There are numerous issues that could be material to the representation of a client that might be affected by a recent court

decision. The "counsel" guaranteed by the Sixth Amendment must at a minimum know the law that controls the cases on his or her docket particularly as those cases move toward trial. It is not possible to have that knowledge without some mechanism to make oneself aware of recent developments in the law.

█ Given a general responsibility to keep abreast of recent developments in the law, the next issue is how far this responsibility extends. McNamara contends that, at a minimum, it is constitutionally deficient conduct for counsel to be completely unaware that the Supreme Court has granted certiorari to consider the meaning of an element of the offense with which his client is charged and, consequently, to neglect to preserve the point for appeal.

The Government responds that failure to anticipate possible favorable developments in the law and to preserve assignments of error on the basis of those future developments does not constitute ineffective assistance of counsel. *See, Engle v. Isaac,* 456 U.S. 107, 133, 102 S.Ct. 1558, 1574–75, 71 L.Ed.2d 783 (1982); *Elledge v. Dugger,* 823 F.2d 1439 (11th Cir.1987), *cert. denied,* 485 U.S. 1014, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988); *Brunson v. Higgins,* 708 F.2d 1353, 1356 (8th Cir.1983); *Honeycutt v. Mahoney,* 698 F.2d 213, 216–17 (4th Cir.1983); *Watson v. State of North Carolina,* 509 F.Supp. 850, 853 (E.D.N.C.1981). Thus, says the Government, because *Rogers* was the law of the Fourth Circuit at the time of McNamara's trial, it

was not unreasonable for counsel to have failed to anticipate a change in it.

This argument is appealing in its simplicity for it posits the bright-line rule that, if the law has been changed, a lawyer has to know it. If it has not, he does not. However, the argument misses what is the most compelling aspect of McNamara's argument: that counsel's conduct precluded McNamara from appealing based upon an issue which the Supreme Court had decided to review and which, if decided favorably to McNamara's position, would necessitate a remand for a new trial in the event of conviction on the controlling law in the circuit.

Contrary to the Government's suggestion, McNamara does not contend that Donnelly should have been clairvoyant or that he should have anticipated future favorable developments in the law. Rather, McNamara argues that Donnelly should have made himself aware of a significant legal event that already had occurred and had been reported, the granting of certiorari in *Ratzlaf*.[3] A reasonable lawyer armed with this knowledge would have passed it on to his client as a potential and promising basis on which to challenge a conviction.

If Donnelly had discovered the Supreme Court's action before McNamara's trial, he could have objected to Instruction No. 29, preserving the issue for appeal and assuring his client a virtually certain reversal should the Supreme Court change the *Rogers* standard. If Donnelly had learned of the Supreme Court's action between the date of conviction and ten days after sentencing, he

**3.** In one of the cases cited by the Government for the proposition that a lawyer is not responsible for anticipating future developments in the law, certiorari had been granted as to the rule at issue at the time of trial. The *Elledge* case involved an allegation of ineffective assistance concerning counsel's failure to challenge repeated reinterrogation with repeated *Miranda* warnings as a potentially coercive technique. The Supreme Court accepted this argument in *Michigan v. Mosley,* 423 U.S. 96, 102–104, 96 S.Ct. 321, 325–27, 46 L.Ed.2d 313 (1975). The Eleventh Circuit held in *Elledge* that counsel "did not have the benefit of *Mosley*." *Elledge,* 823 F.2d at 1443. It so held because *Mosley* was decided in December of 1975 and counsel's efforts to suppress the confession occurred in March of 1975. Certiorari had been granted in *Elledge* on January 20, 1975.

For several reasons, the court does not conclude from *Elledge* that competent counsel cannot be charged with knowledge that certiorari had been granted in a particular case. First, *Elledge* makes no mention whatsoever of the fact that certiorari had been granted. It does not consider this fact and expressly hold that counsel has no duty to be aware of that fact. Second, counsel's acts in *Elledge* occurred in 1975. The accessibility of up to date legal information at that time was not comparable to its availability today. As technology and resources develop, the minimum knowledge and preparation required of lawyers develops as well. Finally, the case of which counsel was unaware in *Elledge* did not go to the meaning of the elements of the offense charged.

could have informed his client that it provided a basis for appeal.[4] But, because counsel did not discover the Supreme Court's action, he was unable to make an informed decision how best to protect McNamara's rights.

On the facts of this case, the failure to discover the pendency of *Ratzlaf* was deficient conduct under *Strickland*. It was not sufficient to rely solely on the annotations to the United States Code in interpreting the elements of the offense charged. This insufficiency is illustrated by the fact that now, even after the Supreme Court has decided *Ratzlaf* in direct contradiction of *Rogers,* the annotations relied on by Donnelly still reflect *Rogers* as the law in the Fourth Circuit. The wide range of reasonableness requires that counsel take some action to update and verify the state of the law respecting the elements of the offense with which the client is charged. The failure to do that in this case prevented the discovery of *Ratzlaf* and the making of an informed decision on behalf of the client. This, in turn, deprived McNamara of the " 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064.

Of course, courts may not use ineffective assistance of counsel claims to second guess a strategic decision of counsel, even if that decision turns out to have harmed the client's position. *See Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065 (conduct not ineffective if it may be considered sound trial strategy); *United States v. Alexander,* 789 F.2d 1046, 1051 (4th Cir.1986) (*Strickland* does not permit courts to second guess strategic decisions of attorneys). That, however, is not the issue presented by these facts because the undisputed record is that counsel was unaware that the Supreme Court had agreed to review the willfulness issue. As the Fourth Circuit has recently recognized, deficient performance by counsel may in fact

deprive a lawyer of the ability to make a strategic or tactical decision. *Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1358 (4th Cir.1992). That is what happened in this case. Because counsel did not keep up with developments in the law then pending resolution before the Supreme Court, he never reached the point of deciding whether raising *Ratzlaf* would further or hinder his client's case.[5]

■ The court concludes that a lawyer must be aware of the fact that an element of an offense he must defend at trial is under examination by the Supreme Court, particularly where the decision on that issue has the potential to alter the controlling rule in the circuit and likely will be issued while his client's case is on direct appeal if an appeal is taken. At least at the confluence of these factors, it is beyond the wide range of acceptable professional conduct to be unaware of developments in the law.

### The Issue of Prejudice

■ McNamara must also establish that Donnelly's conduct prejudiced him in the proceedings. To satisfy the prejudice facet of *Strickland,* "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

The "proceeding" referred to in *Strickland* is not limited to the trial. Determination of whether there is a reasonable probability that, absent the deficient conduct, the result of the proceeding would have been different allows the court to consider what would have occurred had the case been appealed. For

---

4. Had no objection been raised at trial, the plain error doctrine would have permitted assertion of the error on appeal if the law had changed while the appeal was pending. *See United States v. Rogers,* 18 F.3d 265 (4th Cir.1994); *United States v. Retos,* 25 F.3d 1220 (3rd Cir.1994). As McNamara was sentenced on October 15, 1993 and the Supreme Court decided *Ratzlaf* on January 11, 1994, the law of *Rogers* would likely have changed while the appeal was pending.

5. Any efforts to defend the inaction here at issue as a protected strategy decision would be "exercises in retrospective sophistry." *Griffin,* 970 F.2d at 1358. The Fourth Circuit has made clear that "[t]olerance of tactical miscalculations is one thing; fabrication of tactical excuses is quite another." *Id.* at 1359. Here counsel failed to challenge *Rogers* simply because he was ignorant of the fact that there was available a basis on which to challenge it.

example, in the context of capital sentencing, the Supreme Court and the Fourth Circuit have held that the relevant inquiry is whether there is a reasonable probability that the sentencer, including the appellate court to the extent that it may weigh the evidence, would have come to a different result. *Strickland v. Washington,* 466 U.S. 668, 695, 104 S.Ct. 2052, 2068–69, 80 L.Ed.2d 674 (1984); *Whitley v. Bair,* 802 F.2d 1487, 1493 (4th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987).

■ Consequently, the fact that the court was obligated to apply *Rogers* at trial does not mean that McNamara cannot demonstrate prejudice in the proceeding. Knowledge of *Ratzlaf* by Donnelly and McNamara and an appeal based thereon would have provided grounds for a reversal because the *Ratzlaf* willfulness standard would be applied to the case on direct appeal. *See United States v. Rogers,* 18 F.3d 265 (4th Cir.1994). The question then becomes whether, on retrial of the case under the *Ratzlaf* willfulness standard, there is a reasonable probability that a jury would come to a different result than it did in the first trial.

As the law stands now, and as it would have stood on direct appeal, it is not a crime simply to structure financial transactions in order to avoid reporting requirements of which defendant is aware. The Government must prove that the defendant knew that such structuring was illegal. The Supreme Court held in *Ratzlaf* that "currency structuring is not inherently nefarious." *Ratzlaf,* — U.S. ——, ——, 114 S.Ct. 655, 661. The Court noted several potential purposes for structuring, such as reducing the risk of an unnecessary and costly audit or reducing the risk of burglary that might result from possession of deposit slips for large sums of money. *Id.*

In making the prejudice determination, "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland,* 466 U.S. at 695, 104 S.Ct. at 2069. The evidence persuaded the jury that McNamara had structured transactions in order to evade reporting requirements. In so doing, the jury had to disbelieve McNamara's testimony that he

did not structure. It is certainly possible that, on retrial, a jury would conclude that McNamara knew full well that structuring was illegal. However, McNamara need not demonstrate affirmatively that the jury's verdict would have been different absent the deficient conduct. *Griffin v. Warden, Maryland Correctional Adjustment Center,* 970 F.2d 1355, 1359. Under *Strickland,* "[i]f a petitioner establishes a *reasonable probability* that the result would have been different, prejudice is established. Moreover, a 'reasonable probability' is simply 'a probability sufficient to undermine confidence in the outcome.'" *Griffin,* 970 F.2d at 1359, citing *Strickland,* 466 U.S. at 694, 104 S.Ct. at 2068.

McNamara testified at trial that he had not engaged in structuring and that he did not know about the federal reporting requirements. In convicting McNamara of structuring, the jury obviously disbelieved this testimony. What the jury was not required to decide, however, was whether McNamara knew that it was illegal to structure transactions to avoid the reporting requirement.

The Government argues that the *Ratzlaf* willfulness element was not at issue in McNamara's trial because McNamara testified that he had never received large amounts of cash from McNally or Panis to structure, and that whether McNamara structured with knowledge that it was illegal to do so was not at issue. From this, the Government concludes that the omission of the additional *Ratzlaf* element was "clearly without any actual prejudice." Response to Motion to Vacate at 3 n. 1.

The argument misses the mark for several reasons. First, it is factually incorrect to say that the *Ratzlaf* element was not at issue in the trial. The fact that McNamara denied having structured transactions does not amount to a concession that he knew structuring was illegal. It would be the Government's burden to prove this element beyond a reasonable doubt. Second, it is not inconsistent for a defendant to argue that he did not structure and that the Government has failed to prove that he knew structuring was illegal. Third, it is not inconsistent for a defendant to argue that he did not structure

while also emphasizing that he did not even know of the antistructuring law. Fourth, a jury could reasonably have concluded from McNamara's testimony that, even if he did structure transactions to avoid the reporting requirement, he did not know of a legal duty not to do so. Under *Ratzlaf,* this conclusion would require acquittal.

Finally, the court may not assume that the trial would have followed the same course had the *Ratzlaf* element been included in the instructions. McNamara might have concluded that the *Ratzlaf* element increased the Government's burden so substantially that he need not even take the stand. To the extent that Donnelly's error affected McNamara's decision to testify on his own behalf, that too could result in prejudice.[6]

Given the fact that the jury had not been instructed that it must find McNamara to have known that his conduct was illegal to convict him of structuring, and given that legitimate strategic decisions may have been influenced by the lack of such an instruction, the court's confidence in the conviction is undermined.

Therefore, the court concludes that McNamara was denied the right under the Sixth Amendment to effective assistance of counsel in the trial that resulted in conviction for structuring. His conviction must be vacated and the case must be retried.

## CONCLUSION

For the reasons discussed above, the judgment of conviction of Warren H. McNamara is vacated and a new trial is ordered.

It is so. ORDERED.

---

**6.** The court will not, of course, entertain any argument that had the *Ratzlaf* element been included at trial, McNamara's testimony would have been substantively different. For example, it might be suggested that had the *Ratzlaf* element been included McNamara would have admitted to structuring, but denied knowledge of its illegality. The court will not allow McNamara to now contend that he testified falsely only because of the deficient representation of his counsel. If that is the case, then the defendant has created

his own predicament and the law will not rescue him at this point.

Despite these concerns, the fact that McNamara could have made the constitutionally protected choice not to testify, could have emphasized his lack of knowledge that structuring was illegal, or could simply have insisted that the government prove all elements beyond a reasonable doubt is sufficient to overcome the Government's argument of a lack of prejudice.